UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHARTER TOWNSHIP OF CANTON, MICHIGAN; CITY OF LIVONIA, MICHIGAN; CHARTER TOWNSHIP OF NORTHVILLE, MICHIGAN; CITY OF ROMULUS, MICHIGAN; CHARTER TOWNSHIP OF VAN BUREN, MICHIGAN; CITY OF WAYNE, MICHIGAN; CHARTER TOWNSHIP OF HURON, MICHIGAN; CHARTER TOWNSHIP OF PITTSFIELD, MICHIGAN; and CHARTER TOWNSHIP OF CLINTON, MICHIGAN, | CIVIL ACTION NO. _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MCKINSEY AND COMPANY, INC., | |
| Defendant. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................1

II.  PARTIES ......................................................................................................8

    A.  Plaintiffs .................................................................................................8

    B.  Defendant ...............................................................................................11

III.  JURISDICTION AND VENUE ...................................................................11

IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.........................12

    A.  Purdue Pleads Guilty to Misbranding OxyContin and Is Bound by a Corporate Integrity Agreement ..............................................................12

    B.  Purdue Hires McKinsey to Boost Opioid Sales in Light of the Company's Guilty Plea and Corporate Integrity Agreement ....................................13

        1.  The Sacklers Distance Themselves from Purdue......................................14

        2.  Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals................................. 16

    C.  What McKinsey Does: "Consulting Is More than Giving Advice"......................18

    D.  Purdue Relies on McKinsey....................................................................21

        1.  The Transformational Relationship ........................................................ 22

    E.  McKinsey Delivers ................................................................................23

        1.  Granular Growth ................................................................................... 24

        2.  "Identifying Granular Growth Opportunities for OxyContin" ................. 26

    F.  Transformation: Purdue Implements McKinsey's Strategies ...............................34

        1.  Project Turbocharge................................................................................ 36

    G.  McKinsey's Efforts Triple OxyContin Sales...........................................39

    H.  McKinsey Was Aware of the Devasting Effects of Opioids and Continued to Provide Marketing Advice...................................................................41

    I.  McKinsey Continued Consulting to Increase the Sale of Opioids Despite theNationwide Epidemic..........................................................................47

|  | 1. | Purdue Pleads Guilty Once Again | 50 |
|---|---|---|---|
|  | 2. | A *Mea Culpa* | 51 |
|  | J. | The Impact of McKinsey's and Purdue's Conduct | 53 |

| V. | FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE | 55 |
|---|---|---|
|  | A. | The Common Purpose and Scheme of the Opioid Marketing Enterprise | 55 |
|  | B. | The Conduct of the Opioid Marketing Enterprise Violated Civil RICO | 58 |
|  | C. | Pattern of Racketeering Activity | 59 |

| VI. | TOLLING OF STATUTES OF LIMITATIONS | 63 |
|---|---|---|
|  | A. | Equitable Estoppel and Fraudulent Concealment | 63 |
|  | B. | McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine | 65 |

| VII. | CAUSES OF ACTION | 66 |
|---|---|---|
| VIII. | PRAYER FOR RELIEF | 82 |
| IX. | JURY DEMAND | 83 |

## I.   INTRODUCTION

1.      This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2.      McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis.

3.      In the years following Purdue Pharma L.P.'s ("Purdue") 2007 guilty plea for misleadingly marketing OxyContin, McKinsey worked closely with Purdue to dramatically increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the wealthy family that has owned and controlled Purdue for decades. McKinsey specifically sought to maximize OxyContin sales by working around the requirements of the Corporate Integrity Agreement that Purdue entered as part of its guilty plea. McKinsey also performed related work for other manufacturers of opioids, including Johnson & Johnson. Through the conduct described in this complaint, McKinsey participated in and helped orchestrate a broad scheme to deceptively market opioids.

4.      McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

5.      On May 10, 2007, John Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the misbranding of OxyContin. Brownlee stated,

Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

6.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS"). For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

7.      In the wake of Purdue's accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. The Corporate Integrity Agreement was a problem to solve. Despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

8.      The problem was complex. As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded as an increasingly dangerous "concentration of risk" for Purdue's owners. Ten days after the guilty plea was announced, David Sackler wrote to his dad, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:

| Message | |
|---|---|
| From: | David Sackler ██████████████████ |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan' ████████ ; Sackler, Dr Richard ████████ |
| CC: | Ives, Stephen A. ████████████████ |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America.  This is the land of the free and the home of the blameless.  We will be sued.  Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

9.      Given concern over this "concentration of risk," the two sides of the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. Shire was discussed as a possible target, as was Cephalon, Inc., UCB S.A., and Sepracor Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

10.     Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

11.     In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue – by then the subject of substantial public scrutiny – appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

12.     In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company dependency for good.

3

13.     Given the complexity of the problem, the Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey, which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

14.     McKinsey accepted their request,[1] and by June 2009 McKinsey and Purdue were working together to increase sales of Purdue's opioids. McKinsey suggested a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey and Purdue then implemented McKinsey's plan. Despite the strictures imposed upon Purdue by the Corporate Integrity Agreement, OxyContin sales began to multiply.

15.     In 2012, Purdue's Corporate Integrity Agreement ended. With its demise, McKinsey's ongoing relationship[2] with Purdue flourished. In 2013, McKinsey proposed, and Purdue implemented with McKinsey's ongoing assistance, *Project Turbocharge*, a marketing

---

[1] This Complaint assumes that Purdue asked McKinsey to design and implement the strategy for boosting opioid sales, and McKinsey accepted Purdue's offer. What is known is that McKinsey performed the work for Purdue. For the purposes of this Complaint, Plaintiffs assume Purdue initiated the relationship with McKinsey. Should it arise that instead McKinsey pitched a proposal to increase OxyContin sales to Purdue, and Purdue accepted that proposal, then Plaintiffs will amend this Complaint accordingly.

This Complaint tells the story of McKinsey's transformational relationship with Purdue.

[2] McKinsey espouses the idea of the "transformational relationship." It is not a one-off seller of advice for any given Chief Executive Officer ("CEO") problem of the day. Rather, McKinsey argues that real value for the client derives from an ongoing "transformational" relationship with the firm. Duff McDonald, *The Firm* 136 -37 (2013) ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970's], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely.").

strategy to increase opioids sales by hundreds of millions of dollars annually. Purdue then picked a new name – *Evolve 2 Excellence* – and adopted it as the theme to its 2014 national sales campaign. With McKinsey's assistance, Purdue trained its sales representatives to operate pursuant to McKinsey's strategy for selling OxyContin.

16.     In 2013, despite significant headwinds, OxyContin sales finally peaked. The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales: the guilty plea identified a specific segment of existing OxyContin sales that were illegitimate and should thus cease. All else being equal, OxyContin sales should have decreased to account for the successful snuffing out of improper sales. In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

17.     Within five years, however, OxyContin sales would triple. McKinsey is responsible for the strategy that accomplished this. It presented specific plans to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[3]

18.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis for Purdue.[4] On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e

---

[3] On February 10. 2018, Purdue announced that it is no longer marketing opioids and disbanded its OxyContin sales force.

[4] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales*, Lawsuit Says, NEW YORK TIMES, (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html.

cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny – fair and unfair – will continue. It is the price we pay for being 'in the arena' and working on what matters."[5]

19. Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated.[6] In addition to its work for Purdue, McKinsey has performed work for "several other companies on opioids."[7]

20. Plaintiffs now argue that the price for being in the arena is more than scrutiny, however fair. This lawsuit argues that, like any other participant in the arena, McKinsey is liable for its deeds. McKinsey is liable for its successful efforts to increase OxyContin sales after

---

[5] See *"The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, FORTUNE MAGAZINE (Mar. 8, 2019), https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/.

The "arena" reference is to Citizenship in a Republic, a speech delivered by Theodore Roosevelt on April 23, 1910: "It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat."

[6] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN BUS. (May 24, 2019), https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No individual's name was attributed.

[7] *See* Drew Armstrong, *McKinsey No Longer Consulting for Purdue, Ends Opioid Work*, BLOOMBERG (May 23, 2019), https://www.bloomberg.com/news/articles/2019-05-24/mckinsey-no-longer-working-with-purdue-halts-opioid-consulting. While Plaintiffs are aware of work McKinsey has performed for other opioid manufacturers, this Complaint concerns McKinsey's work with Purdue.

Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's **mandate** was to increase the sales of the drug **in light of the fact** that Purdue had plead guilty to misbranding, and the owners of Purdue now wished to exit the opioid market due to the perceived reputational risks of remaining there.

21.     McKinsey's task was to thread the needle: to increase OxyContin sales **given the strictures imposed by the 5-year Corporate Integrity Agreement**. This McKinsey did, turbocharging[8] the sales of a drug it knew fully well was addictive and deadly, while paying at least tacit respect to the Corporate Integrity Agreement.

22.     These managerial acrobatics were necessary for Purdue to seem financially attractive enough that a potential buyer would be willing to discount (or even overlook) the otherwise obvious risks associated with purchasing the maker of OxyContin. Purdue was the proverbial hot potato. The Sackler family hired McKinsey to help them hand it to someone else. McKinsey obliged, and devised a successful strategy to purposefully increase the amount of OxyContin sold in the United States. Their efforts **tripled** OxyContin sales.

23.     In the end, of course, the Sacklers never sold Purdue, and no one loaned it money. In time, the full scope of the opioid crisis would be clear not only to experts, insiders, and industry participants. Along with the rest of nation, Plaintiffs are now squarely focused on the crisis.

24.     As reported in the media, in a series of agreements, McKinsey recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

25.     Because of Defendant's misconduct, Plaintiffs are experiencing a severe public health crisis and have suffered significant economic damages, including but not limited to increased costs related to public health, opioid-related crimes and emergencies, criminal justice

---

[8] If the description is overbearing, note that it is McKinsey's own, as described below.

and public safety.  Plaintiffs have incurred substantial costs in responding to the crisis and will continue to do so in the future.  As described in more detail below, these increased costs directly impact nearly every one of Plaintiffs' departments and amount to tens of millions of dollars by even the most conservative estimates.

## II.   PARTIES

### A. Plaintiffs

26.     Plaintiff CHARTER TOWNSHIP OF CANTON, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

27.     Plaintiff CITY OF LIVONIA, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws § 117.1. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

28.     Plaintiff CHARTER TOWNSHIP OF NORTHVILLE, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

29.     Plaintiff CITY OF ROMULUS, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws § 117.1. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

30.     Plaintiff CHARTER TOWNSHIP OF VAN BUREN, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

31.     Plaintiff CITY OF WAYNE, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws § 117.1. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

32.     Plaintiff CHARTER TOWNSHIP OF HURON, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

33.     Plaintiff CHARTER TOWNSHIP OF PITTSFILED, MICHIGAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

34.     Plaintiff CHARTER TOWNSHIP OF CLINTON, MICHGIAN is a body corporate of the State of Michigan and is authorized to bring the causes of action brought herein. Mich. Compiled Laws §§ 42.1 and 41.2. Under Mich. Complied Law § 600.2051 corporate bodies can sue in their corporate name.

35.     Plaintiffs CHARTER TOWNSHIP OF CANTON, MICHIGAN; CITY OF LIVONIA, MICHIGAN; CHARTER TOWNSHIP OF NORTHVILLE, MICHIGAN; CITY OF ROMULUS, MICHIGAN; CHARTER TOWNSHIP OF VAN BUREN, MICHIGAN; CITY OF WAYNE, MICHIGAN; CHARTER TOWNSHIP OF HURON, MICHIGAN; CHARTER TOWNSHIP OF PITTSFIELD, MICHIGAN; and CHARTER TOWNSHIP OF CLINTON, MICHIGAN shall be collectively referred to as "Plaintiffs."

36.     Plaintiffs are responsible for the public health, safety, and welfare of their citizens.

37.     The marketing, distribution and diversion of opioids into Michigan (the "State"), and into the Cities, Counties, Towns and surrounding areas (collectively, "Plaintiffs' Communities"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiffs here seek relief.

38.     Plaintiffs directly and foreseeably sustained all economic damages alleged herein.

39.     Defendant's conduct has exacted a financial burden for which the Plaintiffs seek relief. Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. The Plaintiffs have suffered and continue to suffer these damages directly.

40.     Plaintiffs also seek the means to abate the epidemic Defendant's wrongful and/or unlawful conduct has created.

41.     Plaintiffs have standing to see relief as a "person" under Michigan law.

42.     Plaintiffs have standing to recover damages incurred as a result of Defendant's actions and omissions. Plaintiffs have standing to bring all claims pled herein, including, *inter alia*, to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

**B.  Defendant**

43.     Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

44.     McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

## III.     JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this action because the Plaintiffs bring a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

46.     This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a) because the Plaintiffs are a "citizen" of this State, Defendant is a citizen of a different state and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

47.     This Court has personal jurisdiction over McKinsey because at all relevant times, McKinsey purposely availed itself of the privilege of doing business in the State and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantive and intended

effect in this State and District, among other places.  McKinsey purposefully directed its activities at the State, and the claims arise out of those activities.

48.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in, were directed to, and/or emanated from this District.

### IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

49.     This lawsuit concerns McKinsey's work for Purdue Pharma and its owner, the Sackler family, in the years after the 2007 investigation and subsequent guilty plea relating to Purdue's sales and marketing strategy for its opioids.

50.     McKinsey had an ongoing relationship with Purdue beginning as early as 2003 and lasting decades. By June 2009 McKinsey was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the Corporate Integrity Agreement. McKinsey continued this work after the expiration of the Corporate Integrity Agreement and at least through November of 2017.

### A. Purdue Pleads Guilty to Misbranding OxyContin and Is Bound by a Corporate Integrity Agreement

51.     On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq*.

52.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

53.     Concurrent with the guilty plea by the Purdue Frederick Company, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of HHS on May 7, 2007.

54.     Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

55.     Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

> "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate … including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

> compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

> the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

56.     Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the inspector general.

**B. Purdue Hires McKinsey to Boost Opioid Sales in Light of the Company's Guilty Plea and Corporate Integrity Agreement**

57.     The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family. The interests of

the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[9]

### 1. The Sacklers Distance Themselves from Purdue

58.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

59.     In the event that a purchaser for Purdue could not be found, Richard stated Purdue should "distribute more free cash flow" to the Sacklers. This would have the effect of maximizing the amount of money an owner could take out of a business, and is a tacit acknowledgement that reinvestment of profits in the business was not a sound financial strategy. It is, in other words, an acknowledgement that Purdue's reputation and franchise was irrevocably damaged, and that Purdue's opioid business was not sustainable in the long term.

60.     By 2017, with the hope for any acquisition now gone, the Sacklers' decision to milk opioid profits by "distributing more free cash flow" on the way down had its natural effect on Purdue. Landau, then the CEO, stated, "the planned and purposeful de-emphasis and deconstruction of R&D has left the organization unable to innovate."

---

[9] Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

61.     In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with a separate company. Otherwise, all the money was distributed to the owners.[10]

62.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who worked at Purdue stepped back from their operational roles."[11] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president.

63.     They remained on the board of directors, however.

64.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. ("Rhodes"). The Sacklers established Rhodes four months after the 2007 guilty plea.[12] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled

---

[10] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, WALL ST. J. (June 30, 2019), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6.

[11] Barry Meier, *Pain Killer* 167 (2018).

[12] *Billionaire Sackler family owns second opioid maker*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.

1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[13]

### 2. Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals

65.      The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing[14] to comply with the Corporate Integrity Agreement.

66.      Purdue and the Sacklers were well aware of the constraints posed by the Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives." John Stewart ("Stewart"), the Sacklers' chosen CEO for Purdue at the time, saw an opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch fall outside of the Corporate Integrity Agreement, he asked.[15]

67.      It would not, he was told by Bert Weinstein, Purdue's Vice President of Compliance.[16]

---

[13] *Id.*

[14] As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." *David Crow, How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[15] Purdue Executive Committee Meeting Notes and Actions, at 2 (May 20, 2009).

[16] *Id.*

68.     Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

69.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[17]

70.     Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the Corporate Integrity Agreement internally, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales in light of the Corporate Integrity Agreement and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

71.     In short, Purdue would pay money to McKinsey in exchange for McKinsey telling the company how to sell as much OxyContin as conceivably possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue.

72.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

73.     Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to

---

[17] *How McKinsey Became One of the Most Powerful Companies in the World*, YOUTUBE (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.

assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

74.     Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey, and required his personal approval for any work orders with McKinsey.

75.     In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.

76.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

77.     McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

78.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its *implementation*.

### C. What McKinsey Does: "Consulting Is More than Giving Advice"

79.     Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range

of activities, and the many firms and their members often define these practices quite differently."[18]

80.     Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant would provide a plan to the client that the client may choose to adopt or not.

81.     "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

82.     In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work: "The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may

---

[18] Arthur Turner, *Consulting is More Than Giving Advice*, HARV. BUS. REV. (Sept. 1982), https://hbr.org/1982/09/consulting-is-more-than-giving-advice.

participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job."[19]

83.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[20]

84.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided within the "transformational relationship" McKinsey developed with its clients.[21]

85.     Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together."[22]

86.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[23]

---

[19] *Id.*

[20] McDonald, *The Firm*, at 308.

[21] For   McKinsey's own description of its implementation services, *see* https://www.mckinsey. com/business-functions/mckinsey-accelerate/how-we-help- clients/implementation (last visited Jan. 5, 2021).

[22] McKinsey on Implementation, YOUTUBE (Apr. 30, 2017), https://www.youtube.com/watch? v=rEQOGVpl9CY.

[23] *Id.*

87.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

88.     Indeed, long after McKinsey's advice to Purdue was accepted and deployed as the theme of Purdue's 2014 national sales strategy, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

**D.  Purdue Relies on McKinsey**

89.     McKinsey is not hired to give casual advice. They are a corporate mandarin elite, likened to the Marines or the Jesuits.[24] United States Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of *The Wall Street Journal* that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "So I would have … at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[25]

90.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

---

[24] Said one former McKinsey partner to *BusinessWeek* in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, *The Firm*, at 165.

[25] McDonald, *The Firm*, at 1.

### 1. The Transformational Relationship

91.     McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

92.     At its core, the "transformational relationship" is long-term. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[26] The long-term result can be "dependence" on the McKinsey consultants.

93.     This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, BusinessWeek noted that at that moment, the firm had served four hundred clients for fifteen years or more.[27]

94.     Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has

---

[26] *Id*. at 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here*." (emphasis added).

Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

[27] *Id.* at 136.

not been ascertained, although it is known that McKinsey worked with Purdue for years before Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Corporate Integrity Agreement. The work continued through at least 2018.

95.     McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

96.     McKinsey staffed at least 36 known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

### E.  McKinsey Delivers

97.     By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales in light of the Corporate Integrity Agreement and the diminishing outlook for Purdue.

98.     In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

### 1.   Granular Growth

99.     McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

100.    After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

101.    In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth and exploiting them for all they are worth. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance (2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[28]

---

[28] *The granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

102.     Previously, in an article in the McKinsey Quarterly (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggest that executives should 'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[29]

103.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[30]

104.     One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discovers that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores; then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states. McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth for the client.

105.     Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

---

[29] Mehrdad Baghai et al., *The granularity of growth*, MCKINSEY Q. (May 1,2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[30] *Id.*

### 2.   "Identifying Granular Growth Opportunities for OxyContin"

106.   McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

107.   By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

108.   In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

109.   This McKinsey did in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens' actions.

110.   The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### a.   Marketing – Countering Emotional Messages

111.   From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss

how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

112.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

113.    These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

114.    Purdue's marketing materials from that time period are illustrative of the approach:[31]

---

[31] *State of Tenn. v. Purdue Pharma L.P.*, No. 1-173-18, Complaint at ¶24 (Tenn. Cir. Ct. May 15, 2018).



115.    In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

### b.  Targeting – Selling More OxyContin to Existing High Prescribers

116.    Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them.

117.    On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

28

118.    Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

119.    Many of the historically highest prescribers of OxyContin – those same individuals that McKinsey urged Purdue to target for ever more prescriptions – had prescribed Purdue's OxyContin **before** the 2007 guilty plea, and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

120.    McKinsey identified these physicians – those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers – as optimal targets for a massive marketing push to sell more OxyContin.

121.    McKinsey worked assiduously with Purdue over many years to continually refine this approach, and required ever-more granular data for its analysis. More than three years after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that they could further analyze the individual amounts of OxyContin prescribed by individual physicians.

122.    At the same time, it requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

123.    On July 23, 2013, Purdue's board of directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

124.    In unveiling of *Project Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

125.    McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

126.    By November 2013, McKinsey had obtained the physician-level data they had previously requested, and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

### c.    Titration – Selling Higher Doses of OxyContin

127.    McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

128.    Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

129.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level

of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

130.   Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### d.   Covered Persons – Sales Quotas and Incentive Compensation

131.   McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

132.   Notably, this behavior was contemplated by the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products*." (emphasis added).

133.   By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 in 2012; and 744,000 visits in 2013.

134.   On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

135.   In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board of directors in July 2013, McKinsey nonetheless urged Purdue, in addition to

increasing the focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

136.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time devoted to that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):



137.    By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

138.    Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of

OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

### e. Increasing the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice

139. Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone." Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[32]

140. Notably, this notion that the size of a company's market share is not as important as the size of the *overall* market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in The Granularity of Growth, McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[33]

---

[32] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[33] *The  granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

141.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[34] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[35] McKinsey designed this plan.[36]

## F.  Transformation: Purdue Implements McKinsey's Strategies

142.    As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

143.    Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

---

[34] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[35] *Id.*

[36] Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their ownership of Rhodes. Especially worth noting is that this strategy also benefitted McKinsey's other opioid clients, such as Johnson and Johnson. "They have a huge amount of inside information, which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, INSTITUTIONAL INV. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written.

For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge **of the ways other pharma companies operate** suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

144.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe even more OxyContin, in higher doses, for longer times, to ever more patients.

145.    On January 20, 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

146.    This collaboration would continue over the course of the relationship between Purdue and McKinsey.

147.    During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue, and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

148.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[37] (Purdue and its executives paid $634.5 million in fines.)

---

[37] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

149.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the Corporate Integrity Agreement: Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[38]

### 1.  Project Turbocharge

150.    In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

151.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board of directors to adopt it.

152.    The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

153.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family – not the Purdue board of directors – in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family,

---

[38] *Id.*

including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

154.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

155.    As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E: Evolve to Excellence."[39]

156.    Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

157.    CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

158.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

---

[39] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – ***though we do need to find a better and more permanently appropriate name***." (emphasis added).

159.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

160.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

161.    McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a doubling of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:



162.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project

Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of ***800%***.

163.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[40]

164.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

165.    Purdue implemented McKinsey's suggestion.

**G.  McKinsey's Efforts Triple OxyContin Sales**

166.    Purdue got what it wanted out of McKinsey. Between the years of 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

167.    These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

---

[40] In fact, deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

> Q: Are you familiar with McKinsey & Company?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
>
> Q: Did individuals at McKinsey assist you in getting hired as the CEO of Purdue?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding. (emphasis added).

168.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results were already being realized before the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

169.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue.

170.    In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[41]

171.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a tripling of revenue from OxyContin sales.[42]

172.    Under McKinsey's guidance, OxyContin sales would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[43] That OxyContin sales peaked in 2013 is especially notable, given that overall opioid prescriptions had already

---

[41] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[42] *Id.*

[43] Phil McCausland & Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

peaked three years earlier, in 2010.[44] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

173.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people – the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

174.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

### H. McKinsey Was Aware of the Devasting Effects of Opioids and Continued to Provide Marketing Advice.

175.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson ("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[45]

---

[44] Gery P. Guy Jr, et al., Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015, MORB. MORTAL WKLY. REP. (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

[45] John Gapper, *McKinsey's fingerprints are all over Valeant*, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to join Pearson at Valeant Pharmaceuticals in 2015 as Chief Financial Officer.

176.    Pearson stated, "At McKinsey pharmaceuticals was one of our biggest industry groups."[46] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[47]

177.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

178.    McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals.

179.    In 2012, while advising Purdue, McKinsey described its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

---

[46] Michael Peltz, Mike Pearson's New Prescription for the Pharmaceuticals Industry, INSTITUTIONAL INV. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry.

[47] John Gapper, *McKinsey's fingerprints are all over Valeant*, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

180.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were already prescribing large amounts of Purdue's OxyContin.[48]

181.    As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue*.

182.    What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:

---

[48] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, THE GUARDIAN (June 23, 2019), https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

**Findings on messaging and positioning**



- Opioids overall are still viewed as effective and necessary class of painkillers, though side effects and addiction are concerns

- Key themes from prescriber interviews on abuse deterrents include:
  – Prescriber awareness of abuse deterrence and label change is mixed
  – Opinions on impact/efficacy of abuse deterrence vary
  – Most prescribers are concerned about abuse, but attempt to establish measures to protect themselves
  – Concerns remain that technology does not address oral abuse
  – Less informed prescribers ask for additional information and education around abuse deterrent formulations

- Existing market research suggests that most physicians do not feel that reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers

McKinsey & Company | 27

183.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

184.    Indeed, one reason that **Purdue** had knowledge that their own products were addictive and dangerous is because McKinsey told them.

185.    In February 2009, only months prior to McKinsey's first known work for Purdue,[49] Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled

---

[49] In a 2013 presentation to Purdue's CEO and Vice President of Sales and Marketing, McKinsey referenced McKinsey's "prior experiences serving Purdue that go back 10 years." Presentation by McKinsey to John Stewart and Russell Gasdia entitled *Identifying granular growth opportunities for OxyContin: First Board Update*, at 2 (July 18, 2013). While McKinsey's relationship with Purdue dates back to approximately 2003, the earliest known details of its work for Purdue date to June 2009. What McKinsey did for Purdue before 2009 is not presently known.

"The promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy," stated the matter plainly: "***Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed***." (emphasis added). By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."[50]

186.    Further, Dr. Van Zee identified the precise tactics that McKinsey deployed for Purdue as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid prescribers – coupled with very lucrative incentives for sales representatives – would seem to fuel increased prescribing by some physicians – perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[51]

187.    Of course, to argue that McKinsey had contemporaneous knowledge of the fact that increasing OxyContin sales create even more addiction and misuse in some ways misses the point. It disregards the context in which McKinsey was operating after 2009: advising a monoline manufacturer of opioids about sales and marketing practices for its addictive products while that manufacturer is bound by a five-year Corporate Integrity Agreement covering the very same opioid sales and marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[52] As late as 2018, it remained 84% of Purdue's revenue.[53]

---

[50] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 AM. J. PUB. HEALTH 221, 221, 224 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

[51] *Id.*

[52] Gerald Posner, *Pharma* 524 (2020).

[53] *Id.*

188.    McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the ***overprescribing of opioids*** and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement; to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

189.    If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with Purdue. In June 2009, the earliest known work McKinsey performed for Purdue consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

190.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

191.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[54]

---

[54] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA NETWORK 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

192.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

193.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[55]

194.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[56] (emphasis added).

## I.  McKinsey Continued Consulting to Increase the Sale of Opioids Despite the Nationwide Epidemic.

195.    Marvin Bower ("Bower"), a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[57]

196.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room – that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States – and delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

197.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis,

---

[55] *Id.*

[56] *Id.*

[57] McDonald, *The Firm*, at 35.

McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

198.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

199.    Once again, in perfect McKinsey parlance,[58] these payments for future OxyContin overdoses were christened "Event-Based contracts." To wit:



---

[58] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

200.    Helpfully, McKinsey provided estimates for the future costs of these "events."[59] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

201.    A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:



202.    The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

---

[59] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."

203.     It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Elling raised this concern with Ghatak and suggested corrective action: destroying evidence.

---

Message
_____

From:        Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:        7/4/2018 12:10:13 PM
To:          A G [drarnabghatak@gmail.com]
Subject:     Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +==============================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +==============================================================+

---

204.     Elling's prediction that things would "get tougher" for Purdue would prove prescient.

### 1.  Purdue Pleads Guilty Once Again

205.     On October 20, 2020, Purdue – McKinsey's co-conspirator – agreed with the United States Department of Justice to plead guilty to improper marketing of OxyContin and other opioids again. This time the plea agreement concerned conduct from 2010 to 2018.

206.     Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331, 353, among other charges, relating to its opioid sales and marketing practices after the 2007 guilty plea.

207.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

208.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

209.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

210.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

**2.   A *Mea Culpa***

211.    On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

212.     As the statement indicates, McKinsey stopped doing opioid-specific work "anywhere in the world." Given that Purdue's operations addressed only the United States, the global reach of McKinsey's regret is noteworthy.

213.     In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner ("Reiner"), a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a separate company – also owned by the Sacklers – that sells opioids internationally.

214.     Reiner is currently the Sacklers' "Chief Business Officer" at Mundipharma. As late as 2019, Mundipharma has been asserting many of the same misleading claims about opioids that previously led to criminal liability in the United States.[60]

---

[60] See Erika Kinetz, *Fake doctors, pilfered medical records drive OxyChina sales*, Assoc. Press (Nov. 19, 2019), https://apnews.com/article/4122af46fdba42119ae3db30aa13537c.

215.    "It's right out of the playbook of Big Tobacco. As the United States takes steps to limit sales here, the company goes abroad," stated former commissioner of the U.S. Food and Drug Administration, David Kessler.

**J.    The Impact of McKinsey's and Purdue's Conduct**

216.    The deceptive marketing strategies McKinsey developed and helped to implement worked, as described above.  Deceptive marketing, including marketing McKinsey worked to develop and implement, substantially contributed to an explosion in the use of opioids across the country, including in this State and in Plaintiffs' Communities.

217.    The opioid epidemic has escalated with devastating effects. McKinsey and Purdue's actions related to opioids has caused substantial opiate-related substance abuse, hospitalization, and death.

218.    As a result of the impacts described above, and others, each of the Plaintiffs have incurred substantial expense to address the opioid epidemic that McKinsey's misconduct was a substantial factor in creating.

219.    These impacts include, inter alia:

a.    Costs for treating Opioid Use Disorder (OUD), co-occurring Substance Use Disorder or Mental Health conditions (SUD/MH) and patients suffering from overdoses.  This includes healthcare and medical care, Medication-Assisted Treatment and other withdrawal management services as well as counseling, psychiatric and other mental health care support, case management, and other therapeutic treatment and recovery support services;

b.    Costs associated with providing additional services to individuals with OUD and related SUD/MH conditions, including housing, transportation, education, job placement, job training and/or child care;

c.   Costs for other social services to victims of the opioid epidemic and their families;

d.   Costs related to screening for OUD and other risk factors and programs to reduce the transition from use to disorders;

e.   Costs associated with addressing the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system, and links to treatment and related services.

f.   Costs for providing treatment, recovery support, harm reduction and other services to individuals with OUD and related SUD/MH conditions who are incarcerated.

g.   Other costs associated with opioid-related crime.

h.   Costs associated with addressing the needs, including treatment, recovery services and prevention for pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, the needs of their families, including treating babies with neonatal abstinence syndrome (NAS);

i.   Costs related to with providing treatment of infants born with NAS or other opioid-related medical conditions, or born dependent on opioids due to drug use by their mothers during pregnancy, including educating and supporting families affected by NAS and long-term monitoring and care for these children;

j.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including supportive housing and other residential services relating to children being removed from the home and/or placed in foster care due to custodial opioid use;

k.  Costs related to efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing through education and training;

l.  Costs associated with efforts to discourage or prevent misuse of opioids including through public education campaigns and other prevention initiatives;

m. Costs of training first responders in the proper treatment of drug overdoses; including costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose, and other costs associated with emergency responses by first responders to opioid overdoses;

n.  Costs for drug disposal and take back programs and programs to provide naloxone and/or other drugs that treat overdoses to overdose patients, individuals with OUD and their friends, family members and others in the community who may come into contact with individuals who are overdosing.

## V.   FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE

### A.  The Common Purpose and Scheme of the Opioid Marketing Enterprise

220.   Knowing that these products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which participated in the marketing and sale of opioids as described in this complaint, and manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members") formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

221. In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

222. The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

223. The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing

Enterprise Members' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

224.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

225.    As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

226.    The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

227.    The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the opioids continue to be prescribed and used for chronic pain throughout the area of Plaintiffs, and the epidemic continues to injure Plaintiffs, and consume Plaintiffs' resources.

228.    As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.  The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

229.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.    Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.    Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.    Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d.      Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

e.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f.      Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

230.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

## C.  Pattern of Racketeering Activity

231.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

232.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid

Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators and Plaintiffs' reliance on the Opioid Marketing Enterprise Members' misrepresentations.

233.   Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud Plaintiffs, and other intended victims.

234.   The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain. The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

235.   By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to prescribers, regulators and the public, including Plaintiffs, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

236.   The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a. Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country, including in Plaintiffs' Communities;

b. Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c. Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

d. E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

e. E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

f. Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

g.      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h.      Written and oral communications directed to Plaintiffs and/or Plaintiffs' Communities that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

237.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

238.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

239.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid

Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

240.     Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

241.     The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

### A.  Equitable Estoppel and Fraudulent Concealment

242.     McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public and Plaintiffs that Purdue was undertaking efforts to comply with its obligations under the state and federal controlled substances laws, all with the goal of protecting its registered manufacturer or distributor status in the State and to continue generating profits for Purdue and McKinsey. Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiffs that they were working to curb the opioid epidemic.

243.    McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

244.    McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

245.    McKinsey and Purdue also concealed from Plaintiffs the existence of Plaintiffs' claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to stop its deceptive marketing and report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

246.    Plaintiffs did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

247.    Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Plaintiffs deceived the medical community, consumers, and Plaintiffs.

248.    Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

249.   McKinsey intended that their actions and omissions made with Purdue would be relied upon, including by Plaintiffs. Plaintiffs did not know and did not have the means to know the truth, due to McKinsey and Purdue's actions and omissions.

250.   Plaintiffs reasonably relied on McKinsey and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

## B. McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine

251.   In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

252.   Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations. At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying

and political contributions— eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this complaint.

253.   As all of the government actions against the Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

254.   In addition, McKinsey's consulting services were given confidentially, and the content of those services was not public.  Plaintiffs did not have knowledge of the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceedings revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this complaint. Information in the public domain was insufficient to place Plaintiffs on notice of McKinsey's unlawful conduct, prior to 2020.  For these reasons, any statutes of limitations applicable to Plaintiffs' claims did not begin to run and have been tolled until 2020.

255.   In addition, McKinsey is estopped from relying on any statute of limitations defense because its unlawful practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Plaintiffs and Plaintiffs' Communities.

## VII.    CAUSES OF ACTION

### Count I: Racketeer Influenced and Corrupt Organizations (RICO)
### 18 U.S.C. § 1961, et. seq.

256.   Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

257.    This claim is brought by Plaintiffs against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

258.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

259.    Each Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

260.    The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

261.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

262.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the

enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

263.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

264.    Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

265.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

266.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

267.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to

defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

268.    The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.    Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b.    Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

269.    Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the Opioid Marketing Enterprise's fraudulent scheme.

270.    Because the Opioid Marketing Enterprise Members disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot

be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiffs have described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, and how those acts were in furtherance of the scheme.

271.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators and Plaintiffs. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

272.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

273.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators and the Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the

same victims, including consumers, prescribers, regulators and the Plaintiffs. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

274.   Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

275.   As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

276.   The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. Plaintiffs' injuries were not unexpected, unforeseen or independent. Rather, as Plaintiffs allege, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

277.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

278.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiffs and Plaintiffs' Communities. Defendant's misconduct has contributed to a range of social problems, including addiction, violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more of Plaintiffs' resources are devoted to addiction-related problems.

279.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. Plaintiffs' injuries, as alleged in this complaint, and expressly incorporated herein by reference, include, inter alia:

a.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.    Costs of training first responders in the proper treatment of drug overdoses;

c.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

      d.     Costs associated with emergency responses by first responders to opioid overdoses;

      e.     Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

      f.     Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

      g.     Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

      h.     Costs associated with opioid-related crime.

280.    Plaintiffs' injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would need to spend resources on addressing the impacts of the opioid epidemic as described herein.

281.    Plaintiffs are the most directly harmed entities and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

282.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

a.      Actual damages and treble damages, including pre-suit and post-judgment interest;

b.      An order enjoining any further violations of RICO;

c.      An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.      An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.      An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

f.      An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g.      An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

h.      An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research or studies related to its work with Purdue and other manufacturers of opioids;

i.      An order divesting McKinsey of any interest in, and the proceeds of any work related to opioids;

j.      Forfeiture as deemed appropriate by the Court; and

k.      Attorneys' fees and all costs and expenses of suit.

## Count II: Public Nuisance

283.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

284.    McKinsey, through its work with Purdue and other opioid industry participants, has created and continues to perpetuate and maintain a public nuisance under statutory and/or the common law in Plaintiffs' Communities through the massive marketing and distribution of millions of doses of highly addictive, commonly abused prescription pain killers known as opioids.

285.    The action is brought by Plaintiffs to abate the public nuisance created by McKinsey through its work with Purdue.

286.    Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

287.    McKinsey has created and/or assisted in the creation of a condition that significantly interferes with public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

288.    McKinsey's unlawful conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, have fueled an opioid epidemic within Plaintiffs' Communities that constitutes a public nuisance. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, counties, towns, and communities.

289.    The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

290.    McKinsey knew and should have known that Purdue's and other opioid manufacturers' promotion of opioids was false and misleading, and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

291.    McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

292.    McKinsey has breached its duties to Plaintiffs by disseminating false and misleading information through Purdue regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive pain killers.

293.    Working through Purdue, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the marketing and distribution of prescription opioids.

294.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of members of Plaintiffs' Communities and interfered with the comfortable enjoyment of life and property of others.

295.    Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

296.    McKinsey's acts and omissions affect the entire communities of the Plaintiffs.

297.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Plaintiffs' Communities.

298.    But for McKinsey's actions, opioid use—and, ultimately, misuse and abuse—would not be as widespread as it is today, and the opioid epidemic that currently exists would have been averted.

299.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, constitutes unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others.

300.    Logic, common sense, justice, policy and precedent indicate McKinsey's conduct has caused the damage and harm complained of herein.  McKinsey knew or reasonably should have known that, in devising and assisting Purdue with implementing a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed in the State and in Plaintiffs' Communities, it would endanger the health and safety of residents of Plaintiffs' Communities.  Thus, the public nuisance caused by McKinsey in Plaintiffs' Communities was reasonably foreseeable, including the financial and economic losses incurred by Plaintiffs.

301.    As a direct and proximate result of McKinsey's wrongful conduct as set forth herein, McKinsey negligently, intentionally and/or unreasonably interfered with the rights of Plaintiffs and Plaintiffs' Communities to be free from unwarranted injuries, addictions, diseases, sicknesses, overdoses, and criminal actions, and have caused ongoing damage, harm and inconvenience to Plaintiffs and Plaintiffs' Communities, who have been exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other adverse consequences from the use of addictive prescription drugs, and have been adversely affected by

the addiction and abuse of others in the communities from these highly additive prescription pain medications.

302.   McKinsey also has a duty to abate the public nuisance caused by the prescription opioid epidemic.

303.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

304.   McKinsey has failed to abate the nuisance it created.

305.   Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

306.   Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

307.   As a direct result of McKinsey's conduct, Plaintiffs and Plaintiffs' Communities have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial and other services.

308.   McKinsey is liable to Plaintiffs for the costs borne by Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

**Count III: Civil Conspiracy**

309.   Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

310.   McKinsey and Purdue, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and

Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

311.    Purdue, other manufacturers of opioids, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this complaint. Their aggressive marketing campaign enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide, in the State and in Plaintiffs' Communities.

312.    Without Purdue, other manufacturers of opioids, and McKinsey's misrepresentations, which created demand, they would not have been able to sell the increasing quantity of prescription opioids for non-medical or inappropriate purposes.

313.    None of the opioid manufacturers or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

314.    Purdue, other manufacturers of opioids, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other manufacturers of opioids, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating Federal and state laws, and turning a blind eye to diversion of prescription opioids.

315.    McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of HHS for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding. McKinsey

assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

316.    McKinsey, a majority of the Purdue board of directors, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely-held company.

317.    As a result of the concerted action between the Purdue, other manufacturers of opioids, and McKinsey, Plaintiffs and Plaintiffs' Communities have suffered damages.

318.    Purdue, other manufacturers of opioids, and McKinsey are jointly and severally liable for the results of their concerted efforts.

## Count IV: Unjust Enrichment

319.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

320.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within Plaintiffs' Communities, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' Communities.

321.    Plaintiffs have expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

322.    Plaintiffs have conferred a benefit upon McKinsey by paying for what may becalled McKinsey's externalities—the costs of the harm caused by McKinsey's negligent or otherwise unlawful marketing, distribution and sales practices.

323.    McKinsey is aware of this obvious benefit, and that retention of this benefit is unjust.

324.   Plaintiffs have paid for the cost of McKinsey's externalities and McKinsey has benefitted from those payments because they allowed McKinsey, along with Purdue and other opioid manufacturers, to continue providing customers with a high volume of opioid products. Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Plaintiffs lack a remedy provided by law.

325.   McKinsey made substantial profits while fueling the prescription drug epidemic in Plaintiffs' Communities.

326.   McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal and/or unethical acts, omissions, and wrongdoing.

327.   It would be inequitable to allow McKinsey to retain these benefits or financial advantages.

328.   McKinsey's misconduct alleged in this case has caused ongoing and persistent hardship to Plaintiffs.

329.   Plaintiffs demand judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.      Enter judgment against McKinsey and in favor of Plaintiffs;

b.      Award compensatory damages in an amount sufficient to compensate Plaintiffs fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

c.      Award damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care and treatment, additional therapeutic and prescription drug purchases including costs of obtaining naloxone and suboxone, as well as other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment of infants born with opioid-related medical conditions, including NAS; (3) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (4) costs associated with social services, criminal justice and rehabilitation relating to the opioid epidemic; and (5) costs for providing transitional housing for those returning to the community;

d.      Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

e.      Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

f.      Award Plaintiffs their costs of suit, including reasonable attorneys' fees as provided by law;

g.      Award such further and additional relief as the Court may deem just and proper under the circumstances; and

h.      Grant Plaintiffs the right to amend their pleadings to conform to the evidence produced at trial.

## IX.   JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Dated: <u>December 9, 2021</u>

RESPECTFULLY SUBMITTED:


<u>/s/Mark P. Pifko</u>
Mark P. Pifko
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Encino, CA 91436
Tel: 818-839-2333
mpifko@baronbudd.com

Russell W. Budd
J. Burton LeBlanc, IV
Christine C. Mansour
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
cmansour@baronbudd.com

Peter J. Mougey
**LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR, MOUGEY, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel: 850-435-7062
Fax: 850-436-6068
pmougey@levinlaw.com

Anthony J. Majestro
**Powell & Majestro P.L.L.C.**
405 Capitol Street
Suite P-1200
Charleston, WV 25301
Tel: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

James C. Peterson
**HILL, PETERSON, CARPER,
BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV 25311
Tel:  304-345-5667
Fax:  304-345-1519
jcpeterson@hpcbd.com

Michael J. Fuller, Jr.
Paul T. Farrell, Jr.,
**FARRELL & FULLER LLC**
1311 Ponce de Leon Ave., Suite 202
San Juan, Puerto Rico 00907
Tel: 304-654-8281
mike@farrellfuller.com
paul@farrellfuller.com

Robert B. Sickels
Lisa M. Esser
**SOMMERS SCHWARTZ LAW
OFFICES**
One Towne Square
17th Floor
Southfield, MI 48076
Tel.: 248-746-4025
Fax: 248-936-2158
lesser@sommerspc.com

*Attorneys for Plaintiffs*